NORTHWESTERN BELL TELEPHONE
COMPANY, Appellant,

v.

IOWA STATE COMMERCE
COMMISSION, Appellee,

and

Office of Consumer Advocate,
Intervenor–Appellee.

OFFICE OF CONSUMER
ADVOCATE, Appellant,

v.

IOWA STATE COMMERCE
COMMISSION, Appellee,

and

Northwestern Bell Telephone Company,
Intervenor–Appellee.

NORTHWESTERN BELL TELEPHONE
COMPANY, Appellee,

v.

IOWA STATE COMMERCE
COMMISSION, Appellant,

and

Office of Consumer Advocate,
Intervenor.

No. 86–1701.

Supreme Court of Iowa.

Feb. 17, 1988.

Rehearing Denied Mar. 11, 1988.

James R. Maret, Gary D. Stewart, Alexis K. Wodtke and Leo J. Steffen, Jr., Des Moines, for Office of Consumer Advocate.

Susan Allender, Patrick J. Nugent, and David J. Lynch, Des Moines, for Iowa State Commerce Comn.

Robert F. Holz, Jr. of Davis, Hockenberg, Wine, Brown, Koehn & Shors, Des Moines, and William K. Schaphorst, Des Moines, for Northwestern Bell Telephone Co.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, CARTER, and NEUMAN, JJ.

CARTER, Justice.

This is an administrative appeal of a utility rate order issued by the Iowa State Commerce Commission (the commission), now the Utilities Board of the Department of Commerce. Northwestern Bell Telephone Co. (NWB), the Office of Consumer Advocate (OCA), and the commission each appeal from a decision in the district court which affirmed in part and reversed in part a utility rate decision of the commission dated October 4, 1983.

OCA's appeal contends that the commission's order improperly determined NWB's deferred federal income tax liability and improperly failed to require NWB to prove that the compensation paid its officers and employees was reasonable. OCA urges that the district court erred in not correcting these matters on judicial review. The NWB appeal contends the district court erred by: (1) affirming the commission's decision to use a double leverage capital structure for NWB without a proper offsetting adjustment for the capitalization of the long lines department of AT & T, and (2) altering the commission's original order determining not to reduce the rate base by the average amount of accrued but unpaid interest. The commission's appeal asserts that the district court erred by reversing that portion of the commission's order involving customer premise equipment costs.

On December 15, 1982, NWB filed proposed tariff revisions representing an increase in general rates for intrastate telephone service of 8.2% or $49.7 million annually. On June 23, 1983, following an investigation, the commission approved a stipulation which would allow NWB to collect, subject to refund with interest, an interim rate increase of $12.4 million annually.

Hearings were held April 18 through May 12, 1983. On October 4, 1983, the commission issued its decision determining that the tariffs filed by NWB were unjust, unreasonable and, therefore, unlawful.

The commission prescribed two sets of rates for NWB's intrastate telephone service. The phase I rates covered the period from before June 8, 1983, the date NWB deregulated its inside wiring and customer premise equipment. The phase II rates covered the period after June 8. The commission determined that an increase in rates sufficient to produce revenue of $377,876,000 for phase I and of $290,838,000 for phase II was reasonable. The commission ordered NWB to file revised tariffs to correspond with this order. The commission also directed NWB to refund to its customers, with interest and associated sales tax, all sums collected in excess of the rates authorized by the commission.

NWB and the OCA each filed an application for rehearing which the commission denied. The district court, on NWB's application, stayed the commission's order and allowed NWB to continue to collect interim rates.

## I. Standard of Review.

When reviewing commission decisions, the district court functions in an appellate capacity to apply the standards outlined in Iowa Code section 17A.19(8) (1985). On appeal, we apply those standards in determining whether our conclusions are the same as those of the district court. Northwestern Bell Tel. Co. v. Iowa State Commerce Comm'n, 359 N.W.2d 491, 495 (Iowa 1984). Moreover, this court can only consider assigned grounds of error under section 17A.19(8). Michigan Wisconsin Pipe Line Co. v. Iowa State Bd. of Tax Review, 368 N.W.2d 187, 192 (Iowa 1985).

To decide the issues raised herein, we must determine whether the commission's decision was the result of an error of law or "unsupported by substantial evidence in the record made before the agency when that record is viewed as a whole." Iowa Code § 17A.19(8)(e), (f) (1985); see Taylor v. Iowa Dep't of Job Serv., 362 N.W.2d 534, 537 (Iowa 1985). We separately consider the several issues raised on appeal in accordance with these standards.

## II. Deferred Tax Liability.

OCA's appeal urges that the district court should not have altered the commission's determination accepting NWB's computation of a reserve for deferred federal income tax liability. In order to be eligible for an accelerated depreciation deduction, NWB must use, for rate-making purposes, a normalization method of accounting. This requires crediting a reserve account for the amount that NWB's current federal income tax liability is reduced as a result of accelerated depreciation.

The commission originally concluded that NWB's deferred federal income tax liability equaled 41.63% of the difference between the accelerated depreciation deduction and the straight-line depreciation deduction. This was based on the commission's conclusion that Treasury Regulations section 1.167(1)–1(h)(1)(iii) permits the deduction of state income taxes calculated using straight-line depreciation in the calculation of federal income tax liability. NWB challenged this determination in its petition for judicial review and, based on a private letter ruling of the Internal Revenue Service, the commission conceded in the district court that its determination of this issue had been in error.

The district court reversed the commission's order on this issue and held that NWB was allowed to use the statutory deferred tax rate of 46% rather than the 41.63% rate ordered by the commission. OCA argues on this appeal that the original commission order was correct in its application of Treasury Regulations section 1.167(1)–1(h)(1)(iii) and that the IRS letter ruling does not represent a proper interpretation of the applicable federal tax law. We reject this contention.

For rate-making purposes, we believe the issue presented concerning the components of the deferred tax liability is one of operative fact rather than an issue

of law. This involves a determination of how the federal tax regulations are actually being applied to the particular taxpayer by administrative authorities, acting in their official capacity, rather than a finite determination of what this court believes the federal law to be. Judged by this standard, we believe that the district court, at the commission's urging, acted properly in accepting the private letter ruling of the Internal Revenue Service as the best evidence of how the federal tax law was in fact being applied for purposes of determining NWB's deferred tax liability. *See Iowa–Illinois Gas & Elec. Co. v. Iowa State Commerce Comm'n,* 412 N.W.2d 600, 611–12 (Iowa 1987).

### III. *Wage and Salary Adjustment.*

OCA also contends on appeal that the commission acted improperly in allocating the burden of proof on OCA's challenge to NWB's wage and salary expenses. OCA requested a twelve to fifteen percent downward adjustment to NWB's wage and salary expense claiming that the amount proposed was unreasonable.

All parties to the appeal agree that NWB had the burden of proof as to the reasonableness of its wage and salary expenses once these matters had been placed in issue at the commission hearing. Misallocation of the burden of proof by an administrative body is an error of law which may require reversal. *Peoples Memorial Hosp. v. Iowa Civil Rights Comm'n,* 322 N.W.2d 87, 92 (Iowa 1982).

A review of the record indicates certain language in the commission's order which, if viewed in isolation and out of context with other pertinent language contained therein, indicates that OCA was required to prove that the challenged salaries and wages were unreasonable. Notwithstanding this language, our reading of the entire commission order in light of the record convinces us that the commission considered all of the evidence presented, determined that it preponderated in favor of the reasonableness of the challenged compensation, and made a clear and unequivocal finding that the challenged wage and salary expenses were reasonable. Given this circumstance, we refuse to conclude that the burden of proof was misapplied to OCA's prejudice.

The references in the commission's order to a failure of OCA to produce proof on the compensation issue was, we believe, intended to convey the commission's belief that certain abstract theories proposed by OCA in attacking the reasonableness of NWB's wages and salaries required evidentiary support. We find no basis for overturning the order of the commission and the district court on the salary issue.

### IV. *Refusal to Adjust Double Leverage Capital Structure.*

NWB appeals that portion of the district court's order approving the commission's determination not to adjust the double leverage capital structure of NWB and its parent company, AT & T, with respect to the capitalization of the long lines department of the parent company.

Under the double leverage approach, the equity of the subsidiary is reconstituted into the equity, debt and preferred stock of the parent. In rate-making, this determination of the composition of the capital structure of the utility is vital because equity is more expensive than debt. The earnings on equity are taxable to a utility, but interest on debt is a deductible expense. Use of the double leverage concept was approved in theory in *United Telephone Co. v. Iowa State Commerce Commission,* 257 N.W.2d 466, 477–82 (Iowa 1977). The court in *United Telephone* stated that, since the telephone company was a wholly-owned subsidiary of a holding company, "The Company's capital structure must be reflective of the capital structure of the holding company. If it was not made reflective the Company ... would earn a higher rate of return, as affected by the capital structure, than any company not in such a position." *Id.* at 480.

In applying the double leverage approach, the commission made certain adjustments based upon the peculiar capital structure of two subsidiaries of AT & T.

AT & T was the sole owner of Western Electric Co., its manufacturing arm, and Pacific Telephone and Telegraph Co., a telephone operating company. The commission determined that the capital structures of Western Electric and Pacific Telephone and Telegraph were substantially dissimilar to that of NWB and reflected a higher business risk. Therefore, the commission removed Western Electric and Pacific Telephone and Telegraph from AT & T's capital structure in applying its double leveraging approach. This resulted in a lower equity ratio for NWB after double leveraging.

NWB argues that, if the commission deemed it necessary to make weighted adjustments to existing capital structure in applying the double leverage approach, then an additional adjustment which NWB proposed should also have been employed. The adjustment proposed by NWB was based upon the nature of AT & T's long lines division. NWB suggested that the removal of Western Electric and Pacific Telephone and Telegraph from AT & T's capital structure improperly results in an attribution of eighty-four percent equity to the long lines division. This argument is premised on the fact that equity invested in the subsidiaries was levered twice at lower cost funds, once at the parent level and once at the subsidiary level. In contrast, because the long lines division did not issue debt of its own, financial leverage only existed once at that level.

■ Once a rate-making body attempts to give weighted significance to various factors which are inserted in standard rate-making formulas, it invites opposing arguments that other items in the formula which were not weighted should have been. This, we believe, is the crux of the present argument. While there is certainly some merit in NWB's economic theories concerning the effect of the long line division on its capital structure, the commission was not compelled to adopt its approach as a matter of law. Its failure to adopt NWB's approach on the capital structure of AT & T's long line division was not arbitrary or capricious. The commission's determination of capital structure, based on the record as a whole, is supported by substantial evidence and must be upheld.

## V. *Accrued Interest.*

■ A second issue raised by NWB on its appeal is that the district court erred in reversing that portion of the commission's order which refused to adjust its rate base by the average amount of accrued, but unpaid, interest.

The district court apparently made the adjustment at the urging of the commission which, by the time the matter was before the district court, had reconsidered its position on this matter in light of comments contained in our opinion in *Northwestern Bell Telephone Co. v. Iowa State Commerce Commission,* 359 N.W.2d at 499. NWB urges that the commission, as litigant, was not in a position to seek judicial relief from its own order. This contention fails to consider the fact that OCA proposed a reduction based on accrued, but unpaid, interest and, when the commission rejected its position, it petitioned for judicial review of the commission's order on this issue. In granting relief, the district court clearly indicated in its order that it was acting on OCA's petition for judicial review.

In our consideration of the merits of the issue, it appears that the position adopted by the district court is consistent with the views which we expressed in our *Northwestern Bell* decision, 359 N.W.2d at 499, and also represents a long-standing policy in rate-making cases prohibiting shareholders from earning a return on capital contributed by ratepayers. *See id.* at 499. We affirm the determination of the district court on this issue.

## VI. *Allocation of Interstate Expenses to Nonregulated Customer Premise Equipment.*

■ NWB argued successfully in the district court that the commission erred in its allocation of certain interstate expenses between regulated and unregulated activities. The commission has appealed from this portion of the district court's order.

NWB provides and maintains telephones and switchboards known as customer prem-

ise equipment (CPE). When CPE became subject to open competition, the commission deregulated those activities. As a result, for rate-making purposes, the revenues, investments and expenses related to CPE had to be isolated from the other accounts of NWB and separately accounted for as a nonutility function. Moreover, this required an allocation of CPE costs between interstate and intrastate activities. It is the latter allocation which is the issue in this case.

The commission rejected NWB's proposed methodology for accomplishing isolation of CPE costs and required the utility to recompute this adjustment in accordance with a methodology proposed by the commission. The commission argues that the issue is merely one of selection between alternative methods of calculating CPE removal and that the final choice is a matter of regulatory expertise entrusted to the commission by the "reasonable and just" standard of Iowa Code section 476.8 (1983).

The following illustration is helpful to an understanding of the issue.

### CPE COSTS ALLOCATION

A. *NWB Method:*
(1) $1,000,000 (total expenses)
 − 300,000 (interstate expenses)

 $ 700,000 (intrastate expenses)

(2) $ 700,000 (intrastate expenses)
 − 140,000 (70% of $200,000 CPE expense = $140,000, the amount of total CPE expenses allocable to NWB's intrastate operations)

 $ 560,000 (expenses allocated to intrastate operations exclusive of CPE)

B. *Alternate Method:*
(1) $1,000,000 (total expenses)
 − 200,000 (total CPE expenses)

 $ 800,000 (total expenses exclusive of CPE)

(2) $ 800,000 (total expenses exclusive of CPE)
 − 240,000 (30% × $800,000 = $240,000, the amount of total expenses exclusive of CPE allocable to NWB's interstate operations)

 $ 560,000 (expenses allocated to intrastate operations exclusive of CPE)

C. *Commission's Method for Removing CPE Costs:*
(1) $1,000,000 (total expenses)
 − 200,000 (total CPE expenses)

 $ 800,000 (total expenses exclusive of CPE)

(2) $ 800,000 (total expenses exclusive of CPE)
 − 300,000 (30% × $1,000,000 = $300,000, the amount of total expenses allocable to NWB's interstate operations when no CPE expense is excluded from the interstate jurisdiction)

 $ 500,000 (expenses allocated to intrastate operations when *total* CPE expenses and total intrastate expenses are removed from intrastate operations)

This illustration assumes total CPE costs of $200,000, attributable seventy percent to intrastate service and thirty percent to interstate service. The first column indicates NWB's computation. The NWB method shows the total expenses of the company followed by the elimination of the portion of all costs including CPE. The CPE is then calculated by multiplying the total CPE costs ($200,000) by seventy percent. The resulting figure represents the amount of CPE cost allocable to intrastate activity. This figure is then subtracted from total intrastate costs to determine the intrastate costs to be considered for rate-making purposes.

The second column of the illustration is an alternative method proposed by NWB as a method of proving the accuracy of its initial computation. In the alternative method, all of CPE is first removed from total expenses. This leaves $800,000 remaining. From this figure thirty percent of $800,000 ($240,000) is removed. The amount remaining represents intrastate costs after the removal of applicable CPE. Under either method the result is the same. NWB contends that the alternative method proves the accuracy of its initial computation.

The third column in the illustration represents the method adopted in the commission's order and ultimately rejected by the district court. The commission argues

that, because the utility is still permitted by the FCC to recover interstate CPE expenses for interstate purposes, the interstate allocation should be $300,000, not $240,000. This $300,000 interstate allocation is then subtracted from the total plant and expenses (exclusive of CPE) to arrive at the residual amount of plant and expenses to be included in rate-making for the utility's intrastate operations. The commission maintains the $500,000 figure is correct because it properly treats the intrastate allocation as "residual," *i.e.*, the remainder after interstate and CPE deductions are made. NWB suggests that the commission's approach requires a double elimination of the interstate CPE costs.

In considering the commission's argument, the district court believed, and we agree, that it contains no convincing explanation of why consideration of the FCC valuation rules on recovery of interstate CPE costs mandates the subtraction of the full thirty percent of interstate activity ($300,000) in arriving at the intrastate allocation. If $300,000 is the total amount of interstate expense, this figure includes some amount of CPE. The commission's methodology is confusing at best and appears to remove interstate CPE twice.

■ In deciding the issue presented, we conclude that NWB has done more than merely offer an alternative method of computation; it has made a convincing showing that the commission's methodology is flawed and will inevitably produce an inaccurate measure of the rate-making base. Agency action which departs from demonstrable arithmetic standards is subject to correction on judicial review. *See Churchill Truck Lines v. Transportation Regulation Bd.*, 274 N.W.2d 295, 299 (Iowa 1979); Iowa Code § 17A.19(8)(g) (1985).

We have considered all arguments presented by the parties and have determined that the judgment of the district court should be affirmed on all appeals.

AFFIRMED ON ALL APPEALS.